**In re WACCAMAW'S HOMEPLACE, et al.,[1] Debtors.**

**No. 01–00181 PJW.**

United States Bankruptcy Court, D. Delaware.

Aug. 11, 2003.

---

1. In addition to Waccamaw's HomePlace, the Debtors are the following entities: HomePlace of America, Inc.; HomePlace Management, Inc.; HomePlace Stores, Inc.; and HomePlace Stores Two, Inc.

Laura Davis Jones, Scotta E. McFarland, Kathleen Marshall DePhillips, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Wilmington, DE, James A. Stempel, Jonathan P. Friedland, Christian Lane, Kirkland & Ellis, Chicago, IL, Co–Counsel to Debtors and Debtors in Possession.

Michael L. Vild, Christopher P. Simon, The Bayard Firm, Wilmington, DE, Stuart Larsen, Kahn Kleinman, LPA, Cleveland, OH, for PHD, Inc.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Before the Court are the objections of HomePlace of America, Inc., ("Home-Place") to two administrative expense claims of PHD, Inc., ("PHD"). The first claim in the amount of $509,867.11 is based on PHD's pre-petition reclamation demand made to HomePlace (the "Reclamation Claim"). The second claim in the amount of $101,836.64 is for post-petition goods and services provided by PHD (the "Administrative Claim"). This ruling follows a one day evidentiary hearing on October 17, 2002 and post trial briefing. For the reasons set forth below, the Reclamation Claim will be disallowed and the Administrative Claim, in a stipulated reduced amount, will be allowed without being subject to reduction for purported advertising and promotional chargebacks.

## BACKGROUND

On January 16, 2001 each of the debtors in this case filed voluntary Chapter 11 petitions (the "Petition Date").[2] Home-Place operated a chain of retail stores that

---

**2.** The Debtors herein are Waccamaw's Home-Place, HomePlace of America, Inc., Home-Place Management, Inc., HomePlace Stores, Inc., and HomePlace Stores Two, Inc.

sold home furnishings and accessories. PHD is an entity involved in the marketing and distribution of small kitchen appliances and related items to department stores and specialty retailers throughout the United States. PHD and HomePlace had been engaged in a business relationship for several years prior to the Petition Date and PHD was the exclusive supplier of the small appliances sold by HomePlace.

From November 14, 2000 through December 12, 2000 HomePlace received $1,203,867.11 worth of goods from PHD. Recognizing the financial difficulty that HomePlace was experiencing, and believing HomePlace to be insolvent, PHD sent HomePlace a letter on December 12, 2000 demanding the reclamation of the goods it had shipped HomePlace from November 14, 2000 through December 12, 2000 pursuant to § 2–702 of the Uniform Commercial Code ("UCC") (the "Reclamation Demand"). The letter was received on December 13, 2000 (the "Reclamation Date").[3] The parties agreed that $694,000 worth of the those goods were received prior to December 3, 2000.[4] Thus, the total value of the goods received by HomePlace from December 3, 2000 through December 13, 2000 (the "Reclamation Period") is $509,867.11 and the parties stipulated that goods worth that amount were received by HomePlace during that time period (the "Reclamation Goods"). The parties further agreed to reduce that amount by $4,241.43 for quality variances. Thus, PHD's Reclamation Claim is for $505,625.68.

HomePlace, however, objects to the Reclamation Claim with respect to $380,167 worth of goods that it asserts were sold to its retail customers during the Reclamation Period. Specifically, HomePlace asserts that when goods arrived at its stores, they were placed on the sales floor as quickly as possible. Newly-arrived items were ideally placed directly on the shelves. If there was no room on the shelves, items were placed on displays constructed in the aisles or at the ends of each aisle. If necessary, items would be placed on "top stock," which was essentially storage space above the sales shelves, but in view of the customer, that extended upwards approximately ten feet and required the assistance of store personnel to retrieve the items stored there. The typical HomePlace store had a very small storage backroom, which was usually used to store furniture and other large items. Thus, most stores were unable to keep items of the type supplied by PHD in the backroom.

When items were received by HomePlace, a stamp was placed on each item showing the week of delivery. When the new items arrived in the stores, they were placed in front of or on top of merchandise previously there. Unlike with perishable goods in a supermarket there was no need to rotate the goods, i.e., move the goods on the shelves toward the front to be sold before newly-arriving items. Therefore, merchandise received during the 50th week of the year, for example, would likely be put on the shelves in front of, and sold before, merchandise received during the 49th week of the year.

The Reclamation Goods were not segregated and were stocked (and sold) in the normal manner. The time during and after the Reclamation Period was the busiest time of the year for HomePlace as it was

---

3. The Debtor admits to being insolvent on the Reclamation Date for purposes of determining this matter.

4. The parties have agreed that while this amount cannot be part of PHD's Reclamation Claim, PHD is entitled to claim this amount as part of its general unsecured claim.

peak Christmas selling time. Small appliances of the type HomePlace received from PHD were "giftable" items and sold very quickly.

After sending its Reclamation Demand to HomePlace, PHD took no further action with respect to the Reclamation Goods. Instead, it continued to ship more goods to HomePlace, though after the Reclamation Date the amount of goods in each subsequent shipment steadily declined. By the Petition Date, a strong holiday sales season combined with the dwindling shipments from PHD led to inventory being at an all-time low throughout the stores in general and in the small appliance sections in particular. In fact, by the Petition Date, the small appliance section of HomePlace's stores had been condensed and filled with other items so that the stores did not appear to be as depleted of merchandise as they actually were.

The shipments of goods from PHD to HomePlace continued post-petition. Based on invoices dated February 28, 2001 through June 12, 2001 PHD filed its Administrative Claim seeking $101,836.64 for goods sold to and services performed for HomePlace. For various reasons, the parties agreed to reduce the Administrative Claim by $33,509.29. Thus, the Administrative Claim is for $68,327.35. However, HomePlace asserts that the remaining balance should be reduced by an additional $50,883.40 for claimed advertising and promotional chargebacks (the "Advertising Credits").

The Advertising Credits refer to a cooperative advertising program offered between certain manufacturers, PHD, and HomePlace, which essentially worked in the following manner: the manufacturers offered PHD, as a credit, either a fixed amount or a percentage of net sales to fund advertising. That credit was passed from PHD to HomePlace, which would then create and place the advertisements and would withhold the cost of the advertising from future invoices paid to PHD. PHD would then withhold that amount from its future payments to the manufacturers.

In order to be entitled to those credits, HomePlace was required to provide PHD with "proof of performance," usually in the form of copies of the advertisements, that the promotional event took place. The historical relationship between PHD and HomePlace indicates that the parties were lax with respect to complying with the proof of performance requirement. It appears that proof would be submitted with an invoice dated after the credit was already applied or that no proof would be submitted at all. It is undisputed that no proof of performance was supplied in connection with the Advertising Credits requested post-petition.

## DISCUSSION

### I. The Reclamation Claim

 Section 546(c) of the Bankruptcy Code[5] "does not create a new, independent right to reclamation but merely affords the seller an opportunity, with certain limitations, to avail itself of any reclamation right it may have under nonbankruptcy law."[6] *Galey & Lord, Inc. v.*

---

**5.** The Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* is hereinafter referred to as "§ _____."

**6.** Section 546(c) provides:

Except as provided in subsection (d) of this section,

the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has re-

*Arley Corp. (In re Arlco)*, 239 B.R. 261, 266 (Bankr.S.D.N.Y.1999). UCC § 2–702, as adopted by the various states, normally provides the statutory basis for a seller's reclamation demand.[7] In order to be entitled to reclaim goods, a seller bears the burden of proof to establish:

> (1) that it has a statutory or common-law right to reclaim the goods; (2) that the goods were sold in the ordinary course of the seller's business; (3) that the debtor was insolvent at the time the goods were received; and (4) that it made a written demand for reclamation within the statutory time limit after the debtor received the goods.

*In re Victory Markets Inc.*, 212 B.R. 738, 741 (Bankr.N.D.N.Y.1997). Here, there is no question that PHD had reclamation rights. The question is how much, if anything, those reclamation rights are worth.

■ In seeking to value its Reclamation Claim, PHD has continually focused on the Reclamation Demand date, December 13, 2000, as the appropriate date for determining what goods HomePlace still had on hand. In my view, that is incorrect. Instead, the focus should be on the Petition Date.

The focus of § 546(c) is on the petition date. In this case an order was entered on that date establishing a procedure for the treatment of reclamation claims (Doc. # 24), which relieved HomePlace of any obligation under the UCC to surrender goods to PHD (and other sellers of goods). In lieu of such surrender, each seller was given an administrative expense claim in an amount equal to the value of the goods it would have been entitled to take possession of but for the Chapter 11 petition. Obviously, with the filing of the petition, the automatic stay of § 362(a) barred any seller from taking any possessory action.

Section 546(c) provides that the trustee's rights (or those of a debtor in possession) are subject to a seller's reclamation rights. A trustee's rights clearly do not exist until the filing of the chapter petition. The petition date is the date that determines what rights of possession the reclaiming seller has. A reclaiming seller's right to repossess is, of course, limited to the goods still in the buyer's possession.

Furthermore, § 546(c)(2) allows the court to deny repossession in favor of granting the seller an administrative ex-

---

ceived such goods while insolvent, but—
(1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods—
(A) before 10 days after receipt of such goods by the debtor; or
(B) if such 10–day period expires after the commencement of the case, before 20 days after receipt of such goods by the debtor; and
(2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court—
(A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title; or
(B) secures such claim by a lien.

**7.** § 2–702, entitled "Seller's Remedies on Discovery of Buyer's Insolvency," provides in relevant part:

(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.
(3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser under this Article (Section 2–403). Successful reclamation of goods excludes all other remedies with respect to them.

pense claim under § 503(b). A § 503(b) administrative expense claim can only be for a benefit to the estate, which estate does not exist prior to the filing of the chapter petition. Regardless of what sales of the Reclamation Goods took place between December 3, 2000 and December 13, 2000 the trial record shows that very substantial sales took place up through the January 16, 2001 Petition Date.

This case differs from the usual case in which § 546(c) is implicated. Normally, reclamation demands are made around the date of the filing of the chapter petition. Here, however, PHD was aware of HomePlace's insolvency and savvy enough to issue its reclamation demand over one month prior to the chapter petition being filed. However, as noted above, after making its Reclamation Demand PHD inexplicably took no action to protect or enforce its rights with respect to the Reclamation Goods.

The situation here is quite similar to the case of *Tate Cheese Company, Inc. v. Crofton & Sons, Inc. (In re Tate Cheese Company)*, 139 B.R. 567 (Bankr.M.D.Fla.1992). In that case, on September 11, 1990 Tate Cheese Company, Inc. ("Tate") delivered $10,925.65 worth of cheese to Crofton & Sons, Inc. ("Crofton"). *See id.* at 567. Crofton was insolvent at that time and a reclamation demand was made on September 20, 1990. *See id.* at 568. On February 6, 1991 Crofton filed a voluntary Chapter 11 petition. *See id.* Like here, after issuing its reclamation demand, Tate took no action with respect to the goods it sought to reclaim prior to the filing of the bankruptcy petition. *See id.* at 569. Though it was undisputed that Crofton had sold the cheese in the ordinary course of business by the date the petition was filed, Tate nevertheless filed a claim pursuant to § 546(c) seeking either payment of the $10,925.65 as an administrative expense or

the creation of lien in that amount. *See id.* at 568.

Tate contended it had satisfied the requirements of § 546(c) as it had a statutory right to reclaim the cheese, Crofton was insolvent when it received the cheese, a timely written reclamation demand was made, and Crofton possessed at least a portion of the cheese when it received Tate's reclamation demand. *See id.* Unfortunately for Tate, however, the court was "not at all sympathetic to Tate's argument." *Id.* As is true here, "[t]he facts of this case illustrate Tate slept on whatever rights of reclamation it might have had." *Id.* at 569.

 That is true because reclamation "is not a self-executing remedy." *Id.* Addressing the issue of reclamation, a leading treatise has noted:

> The seller's right under UCC § 2–702 to reclaim the goods merely gives the right to make a claim to the goods. It does not give any right of repossession even though the goods could be repossessed by self-help without a breach of the peace. The right of reclamation has none of the attributes of the right to repossess given to a secured creditor by UCC § 9–503.

4A Anderson on the Uniform Commercial Code § 2–702:42 (3d ed.). Stated further, "[r]epossession is distinct from and unrelated to the reclamation of the goods." *Id.* at § 2–702:43. In the Reclamation Demand PHD simply requested: "HomePlace should ship these goods to PHD." HomePlace did not respond to that request. It was then incumbent on PHD to exercise self help or seek judicial intervention. It did neither.

In *Tate*, "although Tate fulfilled the technical requirements of § 546(c) … Tate failed to diligently assert its right of reclamation and, consequently, has lost

that right." *Tate*, 139 B.R. at 569. As a result of its failure to act, Tate "lost whatever reclamation rights it might have had through lack of diligence in asserting those rights." *Id.* at 570. "Moreover, since under this ruling Tate does not have a right of reclamation, Tate is not entitled to an administrative expense in the amount of $10,925.65 pursuant to Section 503(b) or creation of a lien for the $10,925.65 pursuant to Section 546(c) of the Bankruptcy Code." *Id.*

■ Though the period of time that elapsed between the Reclamation Demand and the Petition Date was not as long as the demand-petition date period in *Tate*, the principle set forth in that case is applicable here as PHD took no action to protect its reclamation rights during the Christmas selling season, when there was a rapid turnover of inventory and the Reclamation Goods were rapidly moving off HomePlace's shelves. PHD produced no evidence as to HomePlace's possession of Reclamation Goods on the Petition Date. Absent evidence of the amount of reclamation goods in a debtor's possession at the petition date there is no way to measure the benefit to the estate which would warrant a § 503(b) administrative expense claim in lieu of granting possession.

PHD failed to avail itself of the repossession remedy by the Petition Date. If the petition were never filed in this case and PHD had sought judicial relief on January 16, 2001, its right of repossession would still have been limited to the goods remaining in possession of HomePlace on that date. As stated above, the evidence shows that the inventory in the HomePlace stores was at an all-time low by the Petition Date, with the small appliance section among the most depleted, and, most importantly, PHD offered no evidence as to what, if any, Reclamation Goods were in HomePlace's possession on the Petition Date.

■ With the filing of a chapter petition, PHD was automatically limited to seeking relief from the stay to take possession of the Reclamation Goods. Section 546(c) operates to permit the court to deny that relief and, as an alternative, grant an administrative expense claim in an amount equal to the value of the goods that could have otherwise been repossessed. The seller bears the burden of establishing the value of its rights to be protected by an administrative expense claim. *See In re Video King of Illinois*, 100 B.R. 1008, 1016 (Bankr.N.D.Ill.1989). PHD has not met that burden and is therefore not entitled to an administrative expense claim pursuant to § 546(c).

## II. The Administrative Claim

■ It is undisputed that HomePlace never provided PHD with proof of performance of promotional events that occurred post-petition. It is also true that PHD was very lax with respect to requiring HomePlace to comply with the proof of performance requirements. However, HomePlace is not entitled to receive the Advertising Credits without providing proof of performance. Though PHD frequently chose to waive that requirement, it did not permanently waive its right to require proofs of performance to be submitted. Rather than rely on PHD's admittedly lax attitude while it believed HomePlace was a financially strong entity, HomePlace should have strictly complied with all requirements once it knew that its requests for reimbursement might be subject to more scrutiny while in a Chapter 11 proceeding. HomePlace has not shown that it is entitled to the Advertising Credits and its attempt to reduce PHD's Administrative Claim by those amounts must be denied.

## CONCLUSION

For the reasons stated above, PHD's Reclamation Claim is disallowed. PHD's Administrative Claim is allowed in the amount of $68,327.35 without being subject to reduction for the Advertising Credits.

## ORDER

For the reasons stated in the Court's Memorandum Opinion of this date, PHD, Inc.'s reclamation claim is DISALLOWED and its administrative expense claim is ALLOWED in the amount of $68,327.35.